UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2016 JAN 11 AM 11: 50

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

|  |  |  |
|---|---|---|
| EMMIS COMMUNICATIONS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| ILLINOIS NATIONAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

1:16-cv- 0089 WTL -DML

## COMPLAINT

Plaintiff Emmis Communications Corporation ("Emmis"), for its complaint against

defendant Illinois National Insurance Company ("Illinois National"), states the following:

### Parties and Jurisdiction

1. Emmis is a publicly-traded Indiana corporation with its principal place of

business located in Indianapolis, Indiana.

2. Illinois National is an Illinois corporation with its principal place of business

located in New York, New York.

3. Emmis and Illinois National are "citizens" of different states for purposes of

diversity jurisdiction, and this matter involves claims in excess of $75,000, exclusive of interest

and costs.

4. Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction of this matter on the

basis of diversity of the parties and the satisfaction of the amount in controversy.

**Venue**

5.      Emmis purchased a Directors and Officers Liability insurance policy from Illinois National covering the period from October 1, 2011, through October 1, 2012 (the "2011-12 D&O Policy"), that provided insurance coverage for certain claims arising out of the alleged actions or omissions of Emmis, its officers, and directors which would primarily take place at its corporate headquarters in Indianapolis, which is in this judicial district.  A copy of the 2011-12 D&O Policy is attached as Exhibit A.

6.      Emmis purchased and paid for the 2011-12 D&O Policy from its corporate headquarters in Indianapolis, and the policy was issued and delivered to Emmis at its corporate headquarters in Indianapolis.

7.      Emmis and certain of its officers and directors were named as defendants in a lawsuit filed in federal court in this district and this division entitled *Corre Opportunities Fund, L.P., et al. v. Emmis Communications Corporation, et al.,* and docketed as Case No. 1:12-cv-0491-SEB-TAB (the "COF Lawsuit").

8.      Emmis tendered the COF Lawsuit to Illinois National for coverage under the 2011-12 Policy, but Illinois National improperly denied coverage.  Thus, Emmis defended itself against the COF Lawsuit in Indianapolis.

9.      Pursuant to 28 U.S.C. § 1391, venue is appropriate in this district because the information set forth in paragraphs 6, 7, and 8 of this complaint demonstrates that the events and omissions giving rise to this claim occurred in this district.

**Emmis's Preferred Stock Repurchase Program**

10.     In 1999, Emmis issued 2,875,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock (the "Preferred Stock") for $50 per share.

11.    Emmis's Articles of Incorporation set forth the rights and protections associated with the Preferred Stock, which included:  (1) a right to cumulative annual cash dividends at a rate per annum equal to 6.25% of the stock's $50 liquidation preference; (2) a right to sell the stock back to Emmis at $50 per share, plus outstanding dividends in certain go-private scenarios; and (3) the requirement that any issuance of senior-ranking stock or any adverse amendment to the terms of the Preferred Stock be approved by two-thirds of the outstanding shares of Preferred Stock.

12.    In October 2008, the nationwide financial crisis hit Emmis hard, and like other businesses in the radio and media industry, forced Emmis to cut its workforce, reduce employee benefits, and cut wages and salaries.  In addition, as allowed, Emmis ceased paying dividends on the Preferred Stock at that time.

13.    In June 2011, Emmis entered into an agreement to sell some of its radio stations (the "Merlin Transaction"), which closed on September 1, 2011, and resulted in net proceeds to Emmis of $120 million.

14.    Shortly before closing on the Merlin Transaction, with dividends on Preferred Stock continuing to accumulate but, as allowed, going unpaid, a few large Preferred Stock shareholders approached Emmis management about obtaining liquidity for their shares for approximately 25 cents on the collar.  These Preferred Stock shareholders approached Emmis because the shares of Preferred Stock were illiquid assets that were not readily marketable.

15.    The benefits of such a transaction for Emmis were obvious as credit agencies would view it as extinguishing existing debt at a substantial discount, thereby making it easier for Emmis to refinance senior debt at lower interest rates which would improve the overall financial health of the company.

16.     After the Merlin Transaction closed, Emmis management approached its ten largest shareholders of Preferred Stock in September and October 2011, to determine whether there was interest in selling.

17.     Emmis obtained a loan commitment to fund purchases of Preferred Stock.

18.     On October 25, 2011, Emmis senior management presented its proposal to repurchase Preferred Stock (the "Preferred Stock Repurchase Plan") to the Board of Directors ("Board").

19.     However, one aspect of the Preferred Stock Repurchase Plan was to ensure that Emmis preserved the voting rights of any Preferred Stock it acquired through that plan. Therefore, the Preferred Stock Repurchase Plan involved the use of total return swap ("TRS") transactions and TRS Voting Agreements, rather than ordinary purchase agreements, as the means to preserve the voting rights of the Preferred Stock with such voting rights to be exercised according to Emmis's wishes.

20.     The Board was advised that if Emmis could acquire two-thirds of the Preferred Stock through the TRS transactions, it would provide flexibility in seeking amendments to the Preferred Stock terms.

21.     After deliberation, the Board, including the Preferred Shareholders' representative, unanimously approved the Preferred Stock Repurchase Plan.

22.     On November 11, 2011, Emmis publicly announced the Preferred Stock Repurchase Plan involving the TRS transactions and Voting Agreements, which was the first public notice of the plan to Preferred Shareholders.

23.     On November 14, 2011, Emmis filed an 8-K with the Securities Exchange Commission ("SEC") disclosing TRS transactions with certain holders of Preferred Stock involving approximately 23% of the Preferred Stock.

24.     On November 22, 2011, Emmis entered into a TRS transaction with Alden Capital involving over one million shares of Preferred Stock, with Emmis to acquire the voting rights of those shares.  With this transaction completed, Emmis had now acquired voting rights of 56.8% of the Preferred Stock.

25.     At this point Emmis's senior management believed for the first time that the company might be able to gain control of two-thirds of the outstanding shares of the Preferred Stock.

26.     That same day the Board met to discuss a tender offer to purchase additional shares of Preferred Stock and the implication of gaining voting control of two-thirds of the Preferred Stock.

27.     The Board approved a modified "Dutch Auction" tender offer at that meeting by an 8-1 margin with the Preferred Shareholders' representative as the lone dissenter.

### The Dutch Auction Tender Offer

28.     On November 30, 2011, Emmis publicly announced it would conduct the modified Dutch auction tender offer to purchase up to $6 million in Preferred Stock at a price between $12.50 and $15.56 per share

29.     On December 1, 2011, Emmis submitted its tender offer filing to the SEC and stated that if it succeeded in obtaining two-thirds of the Preferred Stock, it "[m]ay elect to . . . amend various provisions applicable to the Preferred Shares."

30.     On January 5, 2012, Emmis announced that it had purchased 164,400 shares of Preferred Stock in the modified Dutch auction tender.  Because those shares were purchased outright, rather than acquired through TRS transactions, they were retired and returned to the status of authorized but unissued Preferred Stock.

31.     With financing for the Preferred Stock Repurchase Plan about to expire, Emmis purchased and retired an additional 25,700 shares of Preferred Stock at prices of up to $30 per share.

32.     On January 30, 2012, Emmis filed an 8-K stating that the total of "authorized but unissued" shares of Preferred Stock had reached 452,680, and that, if it reissued 390,604 of those shares to a third-party with a voting agreement allowing Emmis to direct the vote, Emmis would have voting control over two-thirds of the Preferred Stock.

33.     Emmis also disclosed in the filing that, if it were able to acquire voting control, it "may elect" to use that power to amend the terms of the Preferred Stock.

### Creation of Retention Plan Trust and Reissuance of Preferred Stock

34.     Initially, in January 2012, Emmis entered into discussions with certain of its lenders about reissuing approximately 400,000 shares of Preferred Stock to the lenders with a voting agreement authorizing Emmis to control the voting of those shares, but the lenders declined.

35.     Subsequently, Emmis's senior management decided to create an employee benefit plan trust (the "Retention Plan Trust") to which it would issue the 400,000 shares of Preferred Stock, which could be voted as directed by the Board.

36.     The proposal for the Retention Plan Trust was first presented to the Board on February 29, 2012, and approved by the Board at a follow-up meeting on March 8, 2012, by an 8-1 vote.

37.     Emmis had two purposes in creating the Retention Plan Trust:  (1) to enable Emmis to acquire voting control over two-thirds of the Preferred Stock and (2) to provide a means of rewarding and retaining non-executive employees who would stay with the company for at least the next two years.

38.     On April 2, 2012, the shareholders approved the creation of the Retention Plan Trust.

39.     Emmis then contributed 400,000 shares of Preferred Stock to the Retention Plan Trust in return for a voting agreement allowing the company to direct the vote of those shares, thereby giving Emmis voting control over two-thirds of the Preferred Stock.

40.     During the February 29, 2012 Board meeting, when the Board discussed the Retention Plan Trust, it also discussed specific amendments to the Articles of Incorporation affecting the terms of the Preferred Stock.  The Board then approved the creation of the Retention Plan Trust and the proposed amendments affecting the terms of the Preferred Stock at its March 8, 2012 meeting by an 8-1 vote with the Preferred Shareholders' appointee again being the lone dissenter.

41.     On March 13, 2012, Emmis filed a preliminary proxy statement with the SEC in which it disclosed for the first time the exact terms of seven proposed amendments to the Preferred Stock.  These amendments included the following:  (1) eliminating Emmis's obligation to pay dividends accumulated since October 2008; (2) changing Preferred Stock from "Cumulative" to "Non-Cumulative" so dividends would not accrue unless declared by the Board,

thereby eliminating the right to elect directors in the event of nonpayment of dividends; (3) eliminating the right of holders of Preferred Stock to require Emmis to repurchase their shares upon certain going-private transactions thereby allowing Emmis to classify Preferred Stock as equity on its balance sheet; and (4) eliminating the right to convert Preferred Stock to Common Stock at specified conversion prices upon a change of control.

42.     This preliminary proxy statement also disclosed Emmis's expectation that the holders of two-thirds of the Preferred Stock would vote in favor of the proposed amendments, based on the TRS and Retention Plan Trust voting agreements.

43.     The preliminary proxy stated that the Board had approved the proposed amendments based on the positive effect they would have on the overall capital structure of Emmis, which would in turn benefit the Common Stock holders.

### Formation of the Lockup Group and the Filing of the COF Lawsuit

44.     In fall 2011, Emmis had contacted three of the plaintiffs in the COF Lawsuit – Zazove Associates, LLC, DJD Group, LLLP, and Kevan Fight – to gauge their interest in the then potential Preferred Stock Repurchase Plan. A fourth plaintiff, Corre Opportunities Fund, L.P., learned of the plan and contacted Emmis in November to discuss it.

45.     None of these Preferred Stock shareholders decided to participate in the plan; rather, over time they came to believe Emmis's goal was to obtain voting control of two-thirds of the Preferred Stock in order to amend its terms.

46.     Therefore, on December 12, 2011, these four Preferred Stock shareholders entered into a formal lockup agreement designed to gain a blocking position by controlling at least one-third of the Preferred Stock vote (the "Lockup Group").

47.    Through communications with Emmis management and filings with the SEC, the Lockup Group revealed its opposition to the Preferred Stock Repurchase Plan and its intent to pursue legal relief to oppose Emmis's exercise of its voting rights with respect to Preferred Stock.

48.    Aware of this impending Claim, Emmis sought to defend its conduct and ensure the litigation addressing the propriety of the Preferred Stock Repurchase Plan would be before an Indiana court well-versed in Indiana corporate law.

49.    Thus, in March 2012, Emmis prepared and filed an action in Marion Superior Court naming the Lockup Group as defendants and seeking a declaratory judgment that the Preferred Stock repurchase plan, the acquisition of voting rights in Preferred Stock, and the creation of the Retention Plan Trust by Emmis were legal under Indiana law.

50.    As expected, on April 16, 2012, the Lockup Group, now joined by a fifth holder of Preferred Stock, filed the COF Lawsuit against Emmis, its officers, and directors. After the filing of the COF Lawsuit in federal court, the parties agreed to stay the declaratory judgment action Emmis had filed in state court.

51.    The initial complaint in the COF Lawsuit contained six counts alleging violations of federal securities laws, two counts alleging violations of Indiana corporate laws, one count alleging failure to follow Emmis's articles of incorporation, and two counts alleging breaches of fiduciary duty.

52.    All eleven counts were directed at implementation of the Preferred Stock Repurchase Plan, the acquisition of the voting rights for such repurchased shares, and the exercise of the voting rights by Emmis over the repurchased shares. A copy of the initial complaint is attached as Exhibit B.

53.    The Lockup Group plaintiffs also filed a motion for preliminary injunction seeking to enjoin Emmis from voting shares it controlled.  The Lockup Group plaintiffs never sought class relief.

## Emmis's Tender and Defense of the COF Lawsuit

54.    Emmis promptly notified its broker, Marsh, of the COF Lawsuit, and Marsh tendered the COF Lawsuit to Illinois National for coverage under the 2011-12 D&O Policy by letter dated April 18, 2012.

55.    Despite receiving notice of the COF Lawsuit in April 2012, Illinois National did not make a prompt coverage determination.  Instead, Illinois National sat on the sidelines while Emmis defended itself.

56.    While Illinois National sat on the sidelines, Emmis defeated the Lockup Group plaintiffs' preliminary injunction as set forth in an order issued August 31, 2012.

57.    A few days later, on September 4, 2012, the shareholders approved the proposed amendments to the Preferred Stock.  Those amendments took effect that same day when Emmis filed the Amended Articles containing the approved amendments with the Indiana Secretary of State.

58.    After the court's denial of the preliminary injunction, plaintiffs filed a motion for leave to file their Second Amended Complaint on October 15, 2012, which the court granted on October 18.  A copy of Plaintiffs' Second Amended Complaint is attached as Exhibit C.  The Second Amended Complaint dropped all claims against the officers and directors and only asserted claims against Emmis.  In addition, the Second Amended Complaint brought additional

claims for money damages alleged to have been sustained as a result of the Preferred Stock Repurchase Plan and the adoption of the amendments altering the terms of the Preferred Stock.

59.     The Second Amended Complaint summarized the basis of plaintiffs' claims as Emmis's attempts to strip the Preferred Stock shareholders of any rights through the following three maneuvers: "(1) the repurchase of shares that Emmis would keep alive, artificially, solely for voting purposes; (2) the conduct of a modified "Dutch Auction" tender offer without making necessary and proper disclosures; and (3) the dumping of repurchased shares into a sham trust controlled by Emmis."   The Second Amended Complaint contained three counts alleging violations of federal securities laws, two counts alleging violations of Indiana corporate laws, two counts for breach of contract, and one count for breach of fiduciary duty.  Like the original complaint, all claims in the Second Amended Complaint arose out of Emmis's implementation of the Preferred Stock Repurchase Plan.

60.     On November 21, 2012, Emmis moved for judgment on the pleadings on plaintiffs' breach of fiduciary duty claim.  In March 2013, Emmis filed a summary judgment motion on all remaining counts.

61.     Emmis vigorously defended the COF Lawsuit without any assistance or reimbursement of Defense Costs by Illinois National.

62.     On February 28, 2014, Emmis obtained judgment on the pleadings on the breach of fiduciary duty claim and summary judgment on the securities, Indiana corporate, and breach of contract claims, thereby disposing of all plaintiffs' claims.

63.     The Lockup Group plaintiffs then appealed the district court's ruling to the Seventh Circuit.  On July 2, 2015, the Seventh Circuit affirmed the district court's ruling below. Plaintiffs did not seek rehearing or certiorari of the Seventh Circuit decision.

64. Emmis was forced to incur substantial costs in defending the COF Lawsuit from inception through termination of the appeal. Emmis's Defense Costs so far have totaled over $4 million and are continuing to grow in connection with a subsequent settlement of the COF Lawsuit which, upon the achievement of various conditions, will result in the dismissal with prejudice of such suit.

## Illinois National's Denial of Coverage

65. Even after the filing of the Second Amended Complaint, Illinois National made little, if any, effort to provide Emmis with a coverage determination.

66. Finally, fourteen months after receiving tender of the COF Lawsuit, Illinois National issued a letter to Emmis dated June 10, 2013, denying coverage under the 2011-12 D&O Policy.

67. The sole basis Illinois National provided for denying coverage was its assertion that the Specific Event Exclusion in the 2011-12 D&O Policy barred coverage because "the COF Lawsuit is a Claim arising out of Event #2 and/or an Interrelated Wrongful Act of Event #2." Illinois National asserted that the COF Lawsuit alleges "related facts, circumstances, situations, transactions or events to the shareholder lawsuits that were brought in connection with the 2010 Go-Private Attempt" in support of its conclusion that "the COF Lawsuit is considered a Claim arising from Event #2 or a Claim alleging, arising out of, based upon, attributable to . . . an Interrelated Wrongful Act of Event #2."

68. Event #2 was defined as "[a]ll notice of claims or circumstances as reported under policy number 8181-0668 issued to Emmis Corporation by Chubb Insurance Companies."

69. The 2010 Go-Private Attempt referred to an attempt by Emmis CEO Jeffrey H. Smulyan ("Smulyan") to take the company private in 2010 because he thought the Common

Stock of the company was undervalued at less than $3 per share. Previously, in 2006, Smulyan had made a proposal to take Emmis private for the price of $15.25 per share, but the Board rejected that proposal.

70.     In 2010, Smulyan formed a company named JS Acquisition, LLC ("JS Acquisition") for the purpose of acquiring Emmis and taking it private. JS Acquisitions arranged financing for the transaction through Preferred Stock shareholder Alden Global Distressed Opportunities Master Fund, L.P. ("Alden").

71.     The 2010 Go-Private Attempt included a proposal that would have converted the Preferred Stock to subordinated debt instruments, which would have required two-thirds approval of the Preferred Stock.

72.     The 2010 Go-Private Attempt resulted in the customary filing of litigation by shareholders of Emmis stock as putative class actions alleging that the go-private attempt undervalued the common shares of Emmis (the "Shareholder Lawsuits"). The Shareholder Lawsuits principally involved claims of breach of fiduciary duty regarding the Board's approval of the 2010 Go-Private Attempt.

73.     Emmis tendered the Shareholder Lawsuits to Chubb, and Chubb provided coverage of the Shareholder Lawsuits under its D&O policy that was in effect from October 1, 2009 through October 1, 2010.

74.     The 2010 Go-Private Attempt failed when Alden withdrew its financing necessary for JS Acquisition to complete the transaction.

75.     Although the initial complaint in the COF Lawsuit contained allegations that the Preferred Stock Repurchase Plan was motivated by the failure of the 2010 Go-Private Attempt and Emmis's desire to punish the Preferred Stock shareholders for that failure, those allegations

were superfluous and irrelevant to the actual claims asserted against Emmis, its officers, and directors.

76.     In addition, the initial complaint in the COF Lawsuit contained alternative theories of liability, including allegations that Emmis, its officers, and its directors committed certain securities violations "negligently" or "recklessly", which allegations were mutually exclusive with any allegation or theory that the Preferred Stock Repurchase Plan was devised with the intent of punishing Preferred Stock shareholders for the failure of the 2010 Go-Private Attempt.

77.     Further, Illinois National first denied coverage in June 2013, eight months after the Lockup Group plaintiffs filed their Second Amended Complaint in the COF Lawsuit. The Second Amended Complaint did not contain any allegations that the Preferred Stock Repurchase Plan, the ensuing exercise of voting rights for such Preferred Stock, the creation of the Retention Plan Trust, or the issuance of Preferred Stock to that trust was motivated by or related to the 2010 Go-Private Attempt. However, Illinois National made no reference to the allegations in the Second Amended Complaint that would justify its denial of coverage.

78.     Emmis contested Illinois National's denial of coverage of the COF Lawsuit and specifically pointed out that the claims in the COF Lawsuit were not dependent on allegations relating to the 2010 Go-Private Attempt and rebutted any assertion that the COF Lawsuit was related to the 2010 Go-Private Attempt or the Shareholder Lawsuits.

79.     In addition, Emmis requested that Illinois National identify the alleged Wrongful Acts in the COF Lawsuit and the alleged Wrongful Acts in the Shareholder Lawsuits or the 2010 Go-Private Attempt that could be considered "Interrelated Wrongful Acts" for the purpose of justifying its coverage denial.

80.     Illinois National remained steadfast in its denial of coverage and did not respond directly to the inquiries raised by Emmis.

81.     Instead, in December 2013, Illinois National issued a letter to Emmis stating that coverage for the COF Lawsuit was barred by Event #1 of the Specific Event Exclusion because the COF Lawsuit involved Interrelated Wrongful Acts with Note 10 of a 10-Q filing with the Securities Exchange Commission ("SEC") disclosing the 2010 Go-Private Attempt being pursued by Smulyan through JS Acquisition.

82.     In addition, the letter asserted that coverage for the COF Lawsuit was barred by Event #2 of the Specific Event Exclusion.  Without providing any in-depth or concrete analysis, Illinois National simply concluded that the COF Lawsuit involved Interrelated Wrongful Acts with the Shareholder Lawsuits and the lawsuit captioned as *Alden Global Distressed Opportunities Master Fund, L.P. v. Smulyan, et al.,* Case No. 605402/2011 in the Supreme Court of the State of New York, County of New York (the "Alden Lawsuit").

83.     The Alden Lawsuit arose out of the termination of the 2010 Go-Private Attempt and asserted claims for breach of fiduciary duty against Emmis's officers and directors for agreeing to fund a lawsuit by JS Acquisition against Alden for withdrawing funding for the 2010 Go-Private Attempt in return for a share of any recovery.

84.     Chubb had concluded that the Alden Lawsuit was a "Related Claim" to the Shareholder Lawsuits under its policy, and it provided coverage for both the Shareholder Lawsuits and the Alden Lawsuit.

85.     When Emmis continued to challenge Illinois National's coverage determination that the COF Lawsuit involved Interrelated Wrongful Acts with the Shareholder Lawsuits, the Alden Lawsuit, or the 2010 Go-Private Attempt, Illinois National requested that Emmis obtain a

coverage position from Chubb on whether it considered the COF Lawsuit to involve a "Related Claim" under its policy with the other suits.

86.     Chubb determined that the 2010 Go-Private Attempt, the Shareholder Lawsuits, and the Alden Lawsuit were not related to the COF Lawsuit. Chubb noted that the Shareholder Lawsuits consisted of purported class claims brought by holders of Common Stock. Although Chubb recognized that the 2010 Go-Private Attempt contained a proposal by which two-thirds of the Preferred Stock holders would have to approve the conversion of their shares to subordinated debt, Chubb stated that the acts that formed the basis of the COF Lawsuit were TRS transactions, a modified "Dutch Auction" tender, and a proposed issuance of shares of preferred stock to an employee benefit plan. Chubb acknowledged that both lawsuits referred to preferred stock and included claims of breach of duty, but found that "[t]he alleged breaches relate to entirely different alleged facts."

87.     Counsel for Emmis then forwarded Chubb's coverage determination to counsel for Illinois National.

88.     Despite having asked for Chubb's coverage position on the COF Lawsuit, Illinois National ignored Chubb's assessment, dismissed it as irrelevant, and labeled it as incorrect. In fact, after receiving the Chubb position, Illinois National, for the first time, asserted that the COF Lawsuit involved Interrelated Wrongful Acts with the Alden Lawsuit, thereby purportedly confirming its denial of coverage under the Specific Event Exclusion #2.

89.     The Preferred Stock Repurchase Plan, the TRS transactions and voting agreements, and the issuance of shares of Preferred Stock to the Retention Plan Trust that served as the basis for the COF Lawsuit were not related to and did not involve Interrelated Wrongful Acts with the 2010 Go-Private Attempt, the Shareholder Lawsuits, or the Alden Lawsuit. In fact,

the Preferred Stock Repurchase Plan was developed as a result of Preferred Stock shareholders that approached Emmis about developing a plan that would enable those shareholders to receive liquidity for their shares.  It had nothing to do with the prior effort or a new effort by Emmis's CEO Smulyan to attempt to take the company private.

### Count I – Breach of Contract

90.     Emmis incorporates by reference the allegations contained in Paragraph 1 through 89 of this complaint as though fully set forth herein.

91.     The AIG Policy provided coverage in the amount of $10 million, subject to a Securities Retention of $1 million for any Securities Claim.

92.     All of the claims asserted in the COF Lawsuit satisfy the definition of Securities Claim under the 2011-12 D&O Policy.

93.     Due to the intensive nature of the COF Lawsuit, including, but not limited to the Lockup Group plaintiffs' request for preliminary injunctive relief, Emmis quickly exhausted its Securities Retention of $1 million.

93.     The 2011-12 D&O Policy provides that Illinois National "[s]hall pay the Loss of any Organization:  (1) arising from any Securities Claim made against such Organization for any Wrongful Act of such Organization . . . ."  (2011-12 D&O Policy at ¶ 1.C(1).)  In addition, the policy states that Illinois National:

> [s]hall pay the Loss of an Organization that arises from any:  (1) Claim . . . made against any Insured Person . . . for any Wrongful Act of such Insured Person . . . but only to the extent that such Organization has indemnified such Loss of, or paid such Loss on behalf of, the Insured Person.

(*Id.* at 1.B(1).)

94.     Under the 2011-12 D&O Policy, Wrongful Act is defined as:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act . . . or (2) with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Organization, but solely in regard to a Securities Claim.

(*Id.* at p. 26.)

95.    Under the 2011-12 D&O Policy, the term Loss includes Defense Costs, and Defense Costs means "reasonable and necessary fees, costs and expenses . . . resulting solely from: (1) the investigation, adjustment, defense and/or appeal of a Claim against an Insured." (*Id.* at p. 21.)

96.    Emmis, as well as its officers and directors, are considered Insureds under the 2011-12 D&O Policy.

97.    Under the terms of 2011-12 D&O Policy, Illinois National was obligated to advance Emmis reimbursement of its Defense Costs incurred in the defense of the COF Lawsuit in a timely fashion once Emmis had exhausted its Securities Retention. The duty to advance or reimburse Defense Costs is comparable to the duty to defend in that an insurer must provide coverage for Defense Costs if there is any possibility that the claims being asserted might result in coverage.

98.    Illinois National breached its contractual obligations by refusing to reimburse Emmis for any of its Defense Costs.

99.    Emmis has already suffered damages in the amount of approximately $3 million as a result of Illinois National's breach of its contractual obligation to reimburse Defense Costs relating to the defense of the COF Lawsuit under the 2011-12 D&O Policy, and such Defense Costs continue to grow.

100.   Illinois National is liable to Emmis for the damages caused by its breach of contract, plus prejudgment interest at the statutory rate of eight percent (8%) per annum pursuant to Ind. Code § 24-4.6-1-102.

### Count II – Breach of the Duty of Good Faith and Fair Dealing

101.   Emmis incorporates by reference the allegations in Paragraphs 1 through 100 of this complaint as though fully set forth herein.

102.   Illinois National's denial of coverage for the COF Lawsuit under the 2011-12 D&O Policy was not based on an assessment of all facts and information known or reasonably available to it.

103.   Illinois National specifically ignored facts that were pled by the Lockup Group plaintiffs in the COF Lawsuit which were mutually exclusive with any allegation or assertion that the Preferred Stock Repurchase Plan was related to or involved Interrelated Wrongful Acts with the 2010 Go-Private Attempt, the Shareholder Lawsuits, and the Alden Lawsuit.

104.   In maintaining its denial of coverage, Illinois National ignored the Second Amended Complaint in which the Lockup Group plaintiffs in the COF Lawsuit stripped any allegation that the Preferred Stock Repurchase Plan was motivated by or resulted from an effort by Emmis to punish shareholders of Preferred Stock relating to the failed 2010 Go-Private Attempt.

105.   Illinois National did not seek and/or refused to consider evidence reasonably available from Emmis, its officers, and directors regarding the establishment of the Preferred Stock Repurchase Agreement, the "Dutch Auction" tender, the TRS transactions, the voting rights agreements, the creation of the Retention Plan Trust, and the issuance of shares to that

trust that would have demonstrated that the COF Lawsuit did not involve Interrelated Wrongful Acts with the 2010 Go-Private Attempt, the Shareholder Lawsuits, or the Alden Lawsuit.

106.    Similarly, Illinois National refused to consider all pleadings and papers filed in the COF Lawsuit or the findings of this Court in disposing of those claims which information further established that the COF Lawsuit did not involve Interrelated Wrongful Acts with the 2010 Go-Private Attempt, the Shareholder Lawsuits, or the Alden Lawsuit.

107.    Illinois National based its coverage denial on allegations that it knew were superfluous and irrelevant to the Securities Claims being asserted in the COF Lawsuit.

108.    In denying coverage for the COF Lawsuit Illinois National placed its own monetary interests ahead of the financial risks to its insured Emmis.

109.    Illinois National breached its duty of good faith and fair dealing to Emmis in ignoring facts that would have required it to provide coverage.

110.    Because Illinois National had no legitimate basis for denying coverage, but sought to and did place its financial interests ahead of Emmis's, it acted in bad faith.

111.    Emmis suffered damages as a result of Illinois National's breach of the duty of good faith and fair dealing and its bad faith.

112.    Illinois National is liable to Emmis for all damages caused by its breach of the duty of good faith and fair dealing and/or its bad faith.

WHEREFORE, Emmis respectfully requests that the Court enter judgment in its favor and against Illinois National and award it all appropriate compensatory damages, punitive damages, prejudgment interest, costs, and all other relief that is just and proper.

## Jury Demand

Pursuant to the Seventh Amendment of the United States Constitution and Rule 38 of the

Federal Rules of Civil Procedure, Emmis hereby requests a trial by jury on all issues so triable

under the law.

Respectfully submitted,

*Thomas F. O'Gara*

Richard A. Kempf, Atty. No. 11597-49
Thomas F. O'Gara, Atty. No. 19678-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Tel: 317-713-3500
Fax: 317-713-3699
rkempf@taftlaw.com
togara@taftlaw.com

Attorneys for Plaintiff
Emmis Communications Corporation

14011978.1