**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **EMMIS COMMUNICATIONS CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 1:16-cv-89-WTL-DML** |
| | ) | |
| **ILLINOIS NATIONAL INSURANCE CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (Dkt.
No. 53) and the Plaintiff's motion for partial summary judgment (Dkt. No. 59). The motions are
fully briefed, and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART**
the Defendant's motion and **GRANTS** the Plaintiff's motion for the reasons set forth below.
The Court also **DENIES** the Plaintiff's motion for oral argument (Dkt. No. 63).

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if
the movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the
admissible evidence presented by the non-moving party must be believed, and all reasonable
inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th
Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all
reasonable inferences in that party's favor."). When the Court reviews cross-motions for
summary judgment, as is the case here, "we construe all inferences in favor of the party against
whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*,

538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted). "'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. <u>FACTS OF RECORD</u>

This suit involves Defendant Illinois National Insurance Company's ("INIC") denial of insurance coverage to Plaintiff Emmis Communications Corporation ("Emmis") for a lawsuit filed against Emmis in this district in 2012. *See Corre Opportunities Fund, LP, et al. v. Emmis Communications Corp., et al.*, 1:12-cv-491-SEB-TAB (hereinafter referred to as "the COF Suit"). The voluminous facts set forth in the parties' briefs are virtually undisputed; indeed, the Plaintiff does not expressly dispute any of the facts contained in the Defendant's Statement of Material Facts Not in Dispute, and the Defendant disputes only one of the facts asserted in the Plaintiff's.[1] The following facts are those facts of record that the Court believes to be either directly relevant to the Court's decision or helpful to put those relevant facts in context.

---

[1]That factual dispute—whether AIG or National Union Fire Insurance Company of Pittsburgh, Pa. was Emmis's primary carrier during the 2010-11 policy period—is not material to the Court's decision.

*Emmis's Preferred Stock*

In 1999, Emmis issued 2,875,000 shares of 6.25% Series A Cumulative Convertible Preferred Stock ("Preferred Stock") for $50 per share. Emmis's Articles of Incorporation set forth the rights and protections associated with the Preferred Stock, which included: (1) a right to cumulative annual cash dividends at a rate per annum equal to 6.25% of the stock's $50 liquidation preference; (2) a right to sell the stock back to Emmis at $50 per share, plus outstanding dividends in certain go-private scenarios; and (3) the requirement that any issuance of senior-ranking stock or any adverse amendment to the terms of the Preferred Stock be approved by two-thirds of the outstanding Preferred Stock.

*The 2010 Go-Private Attempt*

In 2010, the market price of Emmis's Common Stock had fallen to under three dollars per share. Believing this to be an undervaluation, Jeff Smulyan, Emmis's CEO and largest shareholder, proposed a go-private transaction (the "2010 Go-Private Attempt").[2] Smulyan formed a company called JS Acquisition, LLC ("JSA") for the purpose of acquiring all of Emmis's Common Stock. JSA obtained a commitment from Alden Global Distressed Opportunities Master Fund ("Alden") to provide financing for the 2010 Go-Private Attempt. Alden owned 42% of Emmis's Preferred Stock. JSA offered to pay a premium over the market price for the Common Stock and proposed that the Preferred Stock be converted into subordinated debt instruments.

The Emmis Board of Directors approved the offer from JSA on the terms proposed. When a group of Preferred Stock holders formed a lockup group that threatened to object to the

---

[2] In 2006, Smulyan had proposed taking Emmis private by purchasing the Company's Common Stock at $15.25 per share. However, the Emmis Board of Directors rejected his proposal, and Emmis remained a public company.

terms of the conversion of their stock into subordinated debt instruments (the "Go-Private Lockup Group"), JSA negotiated with the Go-Private Lockup Group to provide more favorable terms (the "Exchange Offer Modifications"), which the Go-Private Lockup Group members accepted, thereby paving the way for the Go-Private Offer to proceed. However, after this agreement was reached, Alden withdrew its offer of financing and notified the Securities and Exchange Commission ("SEC") that it was withholding its approval for the Exchange Offer Modifications. This resulted in the failure of the 2010 Go-Private Attempt.

*Litigation Stemming from the 2010 Go-Private Attempt*

Between April 27 and June 18, 2010, seven lawsuits were filed on behalf of Emmis shareholders against Emmis and its officers and directors as putative class actions in response to the 2010 Go-Private Attempt, alleging that the offer grossly undervalued the shares of Emmis and the approval of it constituted a breach of fiduciary duty. *See, e.g.*, Dkt. No. 54-2 at 146 ¶ 5 ("Under the terms of the Transaction, Emmis public shareholders will be cashed-out pursuant to grossly unfair and inadequate terms to the benefit of Smulyan, the controlling shareholder."). The Shareholder Litigation further alleged that the offer was "coercive to the preferred shareholders of Emmis" because "[i]f a preferred stock shareholder does not convert their preferred shares . . . [the] dissenting preferred shares will be converted into Class A common stock immediately prior to the merger and receive the same consideration as Class A common stock shareholders—an amount less than otherwise required by the Company's Articles of Incorporation." *Id.* ¶ 64. The plaintiffs alleged that Emmis's Directors had violated their fiduciary duties to the shareholders by approving the proposal without regard to its fairness, without considering alternatives, and without disclosing all material information to the shareholders and, in so doing, putting their personal interests ahead of those of the shareholders.

Emmis had previously purchased a Directors and Officers ("D&O") and Entity Liability policy from Chubb Insurance ("Chubb") covering claims first made during the period from October 1, 2009, through October 1, 2010 (the "Chubb Policy"). Each of the Shareholder Suits was reported to Chubb, and Chubb accepted coverage of the Shareholder Suits under a reservation of rights.

Each of the Shareholder Suits was voluntarily dismissed following the failure of the 2010 Go-Private Attempt; no class was ever certified in any of them.

Alden's withdrawal of financing for the 2010 Go-Private Attempt also led to litigation. First, in September 2010, JSA filed suit against Alden for breach of its contract to finance the 2010 Go-Private transaction (the "JSA Suit"). In response, on February 16, 2011, Alden filed a derivative action against Emmis's Board of Directors (the "Alden Action") asserting claims of breach of fiduciary duty based on Emmis's agreement, as approved by its Board, to invest in the JSA suit against Alden. Specifically, Alden alleged that the Board's agreement to loan JSA up to $200,000 to pursue its breach of contract suit against Alden in exchange for a portion of any recovery obtained in the suit was illegal and that Smulyan, through JSA, filed the JSA Suit "as a personal litigation vendetta" against Alden for terminating the 2010 Go-Private Attempt and interfering with Smulyan's effort to take Emmis private. Dkt. No. 54-2 at 200 ¶ 4.

On February 14, 2011, Emmis, through its broker, Marsh USA, Inc. ("Marsh"), reported the Alden Action to its D&O carriers for the policy period of October 1, 2010, to October l, 2011, which included National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") and Chubb. National Union denied coverage for the Alden Action based on its policy's Specific Investigation/Claim/Litigation/Event or Act Exclusion. Although Chubb initially denied coverage for the Alden Action as falling outside the policy period, Chubb later

reconsidered and accepted coverage of the Alden Action as a Related Claim to the Shareholder Suits. Chubb determined that the Alden Action and the Shareholder Suits were Related Claims because they both "emanate[d] from the proposed buyout by JSA"—i.e., the 2010 Go-Private Attempt. Dkt. No. 54-2 at 240.

*Emmis Gains Control of Its Preferred Stock*

In June 2011, Emmis entered into an agreement to sell some of its radio stations (the "Merlin Transaction"), which resulted in net proceeds to Emmis of $120 million. Shortly before the closing on the Merlin Transaction, two of Emmis's Preferred Stock shareholders approached Emmis management about obtaining liquidity for their shares. Purchasing its Preferred Stock at a discount would benefit Emmis, as credit ratings agencies would view it as extinguishing existing debt, making it easier for Emmis to refinance senior debt at lower interest rates, which would improve the overall financial health of the company. After the Merlin Transaction closed, Emmis obtained a loan commitment to fund purchases of Preferred Stock. In September and October 2011, Emmis approached its ten largest shareholders of Preferred Stock to determine whether there was interest in selling, and on October 25, 2011, Emmis senior management presented a proposal for a Preferred Stock Repurchase Plan at a Board meeting.

One of the main goals of the Preferred Stock Repurchase Plan was for Emmis to preserve the voting rights of any Preferred Stock it acquired through the plan. Under Indiana law, any shares of Preferred Stock that Emmis acquired through outright purchases would have to be retired and could not be voted. Therefore, the Preferred Stock Repurchase Plan included the use of total return swap ("TRS") transactions and TRS Voting Agreements, rather than ordinary purchase agreements, as the means to preserve the voting rights of the Preferred Stock. If Emmis could acquire two-thirds of the Preferred Stock through TRS transactions, it would have the

ability to amend the Preferred Stock terms.  After deliberation, the Board, including the Preferred Shareholders' representative, unanimously approved implementation of the Preferred Stock Repurchase Plan.

On November 11, 2011, Emmis publicly announced the Preferred Stock Repurchase Plan, which was the first public notice of the plan to Preferred Stock shareholders.  On November 14, 2011, Emmis filed an 8-K with the SEC disclosing the TRS transactions with certain holders of Preferred Stock involving approximately 23% of the Preferred Stock.  On November 22, 2011, as part of a settlement of the litigation between Alden and JSA involving Alden's decision not to finance the 2010 Go-Private Attempt, Alden agreed to enter into a TRS transaction with Emmis involving over one million shares of Preferred Stock.  With this transaction completed, Emmis had now acquired voting rights of 56.8% of the Preferred Stock.

At this point Emmis's senior management believed for the first time that the company might be able to gain control of two-thirds of the outstanding shares of the Preferred Stock.  That same day the Board met to discuss a tender offer and the implications of gaining control of two-thirds of the Preferred Stock.  The Board approved a modified "Dutch Auction" tender offer at that meeting by an 8-1 margin, with the Preferred Shareholders' representative as the lone dissenter.

On November 30, 2011, Emmis publicly announced it would conduct the modified Dutch auction tender offer to purchase up to $6 million in Preferred Stock at a price between $12.50 and $15.56 per share.  One day later, on December 1, 2011, Emmis submitted its tender offer

filing to the SEC and stated that if it succeeded in obtaining two-thirds of the Preferred Stock, it "may elect to . . . amend various provisions applicable to the Preferred Shares."[3]

On January 5, 2012, Emmis announced that it had purchased 164,400 shares of Preferred Stock in the modified Dutch auction tender. Because those shares were purchased outright, rather than acquired through TRS transactions, they were retired and returned to the status of authorized but unissued Preferred Stock. With financing for the Preferred Stock Repurchase Plan about to expire, Emmis purchased and retired an additional 25,700 shares of Preferred Stock at prices of up to $30 per share. On January 30, 2012, Emmis filed an 8-K stating that the total of "authorized but unissued" Preferred Shares had reached 452,680, and that, if it reissued 390,604 of those shares to a third-party with a voting agreement allowing Emmis to direct the vote, it would have voting control over two-thirds of the Preferred Stock. Emmis also disclosed in this filing that if it were able to acquire voting control, it "may elect" to use that power to amend the terms of the Preferred Stock.

In early 2012, Emmis's senior management decided to create an employee benefit plan trust (the "Retention Plan Trust") to which it would issue 400,000 shares of Preferred Stock, which could be voted as directed by the Board under Indiana law. The proposal for the Retention Plan Trust was first presented to the Board on February 29, 2012, and approved by the Board at a follow-up meeting on March 8, 2012, once again by an 8-1 vote. Emmis contributed 400,000 shares of Preferred Stock to the Retention Plan Trust in return for a voting agreement

---

[3]The Court notes that for this and many of the other facts in its brief Emmis cites to the "Factual Background" section of the summary judgment ruling in the COF Suit, which is found at Dkt. No. 54-2 at 246. INIC does not object to this practice, and, in fact, also cites to the summary judgment ruling in its own statement of facts. Accordingly, the Court has accepted these facts as properly supported.

allowing the company to direct the vote of those shares.  At that point, Emmis had gained control over two-thirds of the Preferred Stock.

*Amendments to Articles of Incorporation Affecting Preferred Stock*

At the February and March 2012 Board meetings where the Retention Plan Trust was discussed and adopted, the Board discussed specific Amendments to the Articles of Incorporation affecting the terms of the Preferred Stock and approved the Proposed Amendments for consideration by the Company's shareholders, with the Preferred Shareholders' representative again being the lone dissenter.

On March 13, 2012, Emmis filed a preliminary proxy statement with the SEC in which it disclosed for the first time the exact terms of seven proposed amendments to the Preferred Stock. The amendments included the following:  (1) eliminating Emmis's obligation to pay the Preferred Stock dividends that had accumulated since October 2008; (2) changing the Preferred Stock from "Cumulative" to "Non-Cumulative" so dividends would not accrue unless declared by the Board, thereby eliminating the right of Preferred Shareholders to elect directors in the event of nonpayment of dividends; (3) eliminating the right of holders of Preferred Stock to require Emmis to repurchase their shares upon certain going-private transactions, thereby allowing Emmis to classify Preferred Shares as equity on its balance sheet; and (4) eliminating the right to convert Preferred Stock to Common Stock at specified conversion prices upon a change of control.  This preliminary proxy statement also disclosed Emmis's expectation that the holders of two-thirds of the Preferred Stock would vote in favor of the Amendments, based on the TRS and Retention Plan Trust voting agreements.  The preliminary proxy stated that the Board had approved the Proposed Amendments based on the belief that they would have a

positive effect on the overall capital structure of Emmis, which would in turn benefit the Common Stock holders.

On September 4, 2012, the shareholders approved the proposed amendments to the Preferred Stock. Those amendments took effect that same day when Emmis filed Amended Articles containing the approved amendments with the Indiana Secretary of State.

*The COF Suit*

On April 16, 2012, five Preferred Shareholders filed the COF Suit against Emmis, its officers, and directors. The COF Suit alleged, *inter alia*, that the acquisition of Preferred Stock through TRS transactions and the reissuance of Preferred Stock to the Retention Plan Trust violated various federal securities laws as well as laws governing the conduct of Indiana corporations. The initial complaint in the COF Suit contained six counts alleging violations of federal securities laws, two counts alleging violations of Indiana corporate laws, one count alleging failure to follow Emmis's articles of incorporation, and two counts alleging breaches of fiduciary duty. Both the original complaint and the first amended complaint in the COF Suit expressly allege acts and circumstances surrounding the 2010 Go-Private Attempt, the JSA Suit, and the Alden Action. For example:

> On May 25, 2010, Emmis announced that it had entered into a definitive merger agreement with JS Acquisition, LLC, an entity wholly-owned by Smulyan, which would result in Emmis being taken private. This was Smulyan's second attempt to buy the Company after a failed takeover effort in 2006.
>
> ***
>
> Frustrated by his inability to take Emmis private in 2010, Smulyan hatched a brazen scheme in 2011 to eliminate all the rights and privileges of the Preferred Stock, most notable the right to accrued and future dividends and the Take Private Put Right, by attempting to gain voting control of the Preferred Stock through sham derivative and related party transactions and voting to eliminate the rights and preferences contained in the Certificate. Elimination of these rights and preferences

would render the Preferred Stock essentially worthless and pave the way for Mr. Smulyan to "take Emmis private" at the time of his choosing.

Dkt. No. 1-2 ¶¶ 25, 27 (COF Complaint); Dkt. No. 54-2 ¶¶ 25, 28 (COF Amended Complaint).

The Second Amended Complaint in the COF Suit, which was filed on October 18, 2012, alleges more generally that "[t]wice in the last decade, Emmis has been subject to take-private efforts by Mr. Smulyan, once in 2006 and again in 2010." Dkt. No. 1-3 ¶ 14. That complaint contained three counts alleging violations of federal securities laws, two counts alleging violations of Indiana corporate laws, two counts for breach of contract, and one count for breach of fiduciary duty. It summarized the basis of plaintiffs' claims as Emmis's attempts to strip the Preferred Stock shareholders of any rights through the following three procedures: "(1) the repurchase of shares that Emmis would keep alive, artificially, solely for voting purposes; (2) the conduct of a modified "Dutch Auction" tender offer without making necessary and proper disclosures; and (3) the dumping of repurchased shares into a sham trust controlled by Emmis." *Id.* ¶ 18.

### *Coverage Decisions Regarding the COF Suit*

Emmis purchased a D&O and Entity liability insurance policy covering claims first made during the period from October 1, 2011, through October 1, 2012, from INIC (the "INIC Policy"). The INIC Policy provided coverage for Loss and Defense Costs resulting from Claims (including Securities Claims) for the time in which the COF Suit was filed.

Emmis promptly notified Marsh, the broker through which the INIC Policy was issued, of the COF Suit. Marsh forwarded the COF Suit to INIC for coverage under the INIC Policy by letter dated April 18, 2012. Marsh also forwarded the COF Suit to other carriers that had issued coverage during the 2009-10 and 2010-11 policy periods, including to Chubb for the Chubb Policy.

INIC denied coverage in the COF Suit in a letter to Emmis dated June 10, 2013, which was fourteen months after it received notice of the COF Suit and eight months after the Second Amended Complaint was filed therein. The denial was based on the "Specific Event Exclusion" in the INIC Policy, which is set forth in detail below.

Chubb also denied coverage of the COF Suit, concluding that the COF Suit and the Shareholder Suits were not "Related Claims" to the Shareholder Suits as that term is used in the Chubb Policy.

In light of the coverage denials from INIC and Chubb, Emmis funded its successful defense in the COF Suit, incurring a total of $4,104,188.14 in defense costs, or $3,104,188.14 in excess of its $1.0 million retention. INIC has not reimbursed any of these defense costs.

*Relevant Provisions of the INIC Policy*

There is no dispute that the claims in the COF Suit fall under the INIC Policy's coverage for securities claims and that Emmis's costs of defending the COF Suit, minus the $1 million retention applicable to securities claims, are a covered loss under the policy unless an exclusion applies.

The INIC Policy includes Endorsement #28, which is entitled Specific Investigation/ Claim/Litigation/Event or Act Exclusion. This exclusion provides:

> [I]nsurer shall not be liable to make any payment for Loss in connection with: (i) any of the Claim(s), notices, events, investigations or actions listed under EVENT(S) below (hereinafter "Event(s)"; or (ii) the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) Event(s); or (b) any Claim(s) arising from the Event(s); or (iii) any Claim alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to an Interrelated Wrongful Act (as that term is defined below).

Dkt. No. 1-1 at 66. "Events" is defined to include the following:

1) Events contained within Note 10 of the 10-Q released on July 15, 2010 titled "All Regulatory, Legal and Other Matters" and sub-titled Shareholder Litigation.

2) All notice of claim or circumstances as reported under policy number 8181-0668 issued to Emmis Corporation by Chubb Insurance Companies.

*Id.* "Interrelated Wrongful Act" is defined as "(i) the same or related facts, circumstances, situations, transactions or events alleged in any of the Event(s), and/or (ii) any Wrongful Act(s) that are the same or that are related to those that were alleged in any of the Event(s)." *Id.*

"Wrongful Act" is defined as follows:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged Employment Practices Violation or Third-Party EPL Violation . . . or

(2) with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Organization, but solely in regard to a Securities Claim.

*Id.* at 34.

## III. <u>DISCUSSION</u>

Emmis asserts claims for breach of contract and for the tort of breach of the duty of good faith and fair dealing. INIC moves for summary judgment on both claims; Emmis moves for summary judgment on the breach of contract claim and argues that summary judgment is not appropriate on the tort claim.

### A. Breach of Contract

Emmis alleges that INIC breached the contract between the parties—the INIC Policy— by denying coverage for the COF Suit. Under Indiana law, which the parties agree applies, insurance contracts are governed by the same rules of construction as other contracts. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009).

> The construction of the terms of a written contract is a pure question of law . . . . When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.

*Whitaker v. Brunner*, 814 N.E.2d 288, 293-94 (Ind. Ct. App. 2004). Thus, the first step in applying a contract provision is determining whether the provision in question is ambiguous. "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016). A term is not ambiguous solely because the parties disagree about its meaning. *Id.* Insurance policies are interpreted from the perspective of an ordinary policyholder of average intelligence. *Bradshaw*, 916 N.E.2d at 166. "'We will not bend the language of a contract to create an ambiguity when none exists, but neither will we follow a literal interpretation when [to do so] would lead to an unreasonable or absurd result.'" *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (quoting *Chi. Bd. of Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)).

INIC argues that the INIC Policy did not cover the COF Suit because that suit was excluded from coverage by each provision of the Policy's Specific Investigation/Claim/ Litigation/Event or Act Exclusion ("the Exclusion"). "Generally, a coverage exclusion is an affirmative defense, proof of which is the insurer's burden." *PSI Energy, Inc. v. Home Ins. Co.*,

801 N.E.2d 705, 725 (Ind. Ct. App. 2004) (citations omitted). For the reasons set forth below, the Court finds that INIC has failed to satisfy its burden with regard to each part of the Exclusion and that Emmis is entitled to judgment as a matter of law on its breach of contract claim.

### 1. Section (i)

INIC argues that the COF Suit is excluded by Section (i) of the Exclusion, which states that INIC "shall not be liable to make any payment for Loss in connection with . . . any of the Claim(s), notices, events, investigations or actions listed under EVENT(S) below." INIC argues that the COF Suit is included in Event #2, which is defined as "[a]ll notices of claim or circumstances as reported under [the Chubb Policy]." This language is unambiguous, INIC argues, and as there is no dispute that Marsh reported the COF Suit to Chubb under the Chubb Policy, the COF Suit is a "notice of claim . . . as reported under" the Chubb Policy and is excluded from coverage.

The Court disagrees with INIC that the relevant language is unambiguous. The term "as reported under [the Chubb Policy]" could be read to refer to any claim that is reported under the Chubb Policy at any time, as urged by INIC, but it also reasonably could be read to refer to any claims that had been reported under the Chubb Policy at the time the INIC Policy went into effect, October 1, 2011, as urged by Emmis. The Court finds the latter reading to be the correct one, for several reasons. First, the term is written in the past tense, and thus should be read as referring to events that had already occurred at the time of drafting. While INIC argues that the use of the word "as" somehow supports its reading, it does not articulate how that is the case. Second, under INIC's reading of Event #2, any report under the Chubb Policy made by anyone at any time—presumably even a report made by mistake—would render Section (i) applicable and exclude coverage. *See* Dkt. No. 62 at 2 ("Regardless of whose agent Marsh was, it is undisputed

15

that the COF Suit was reported under the Chubb Policy. Therefore, section (i) of the EVENT(S) Exclusion bars coverage for the COF Suit.").  This is an unreasonable reading of the policy language; there is simply no rational basis for interpreting an insurance policy such that the scope of coverage potentially hinges on a report made by someone other than the insured or its agent.

Finally, pursuant to the *contra proferentem* rule of contract interpretation, if an insurance policy's terms are ambiguous, the language is construed strictly against the insurer.  *Bradshaw*, 916 N.E.2d at 166.  "This is especially true with respect to a policy's exclusion of coverage."  *Id.* INIC argues that this rule of contract interpretation should not apply in this case because "Emmis is a sophisticated corporate insured who was assisted by a broker in negotiating the terms of the manuscript EVENT(S) Exclusion," and "the equal bargaining power between Emmis and INIC, as evidenced by Emmis' direct input into the language of the EVENT(S) Exclusion with Illinois National's underwriter supports application of the EVENT(S) Exclusion that Emmis specifically agreed to include."  Dkt. No. 54 at 18-19; *see also* Dkt. No. 62 at 7.[4]  However, the evidence INIC cites to in support of this proposition in both its initial and reply briefs, Exhibit 1-R (Dkt. No. 54-2 at 359-60), does not have anything to do with the manner in which the INIC Policy (or any policy) was negotiated.[5]  Perhaps INIC intended to refer to Exhibit 1-S, which does involve

---

[4]INIC also states that "Emmis made the decision to report the COF Suit to Chubb and later negotiated the EVENT(S) Exclusion with Illinois National."  Dkt. No. 62 at 7.  INIC cites no evidence in support of this statement, which is seemingly contradicted a few sentences later in the same brief, when INIC states:  "Emmis knew of the language in the EVENT(S) Exclusion and knew that the COF Suit related to the Shareholder Litigation and the Alden Action, which is why it reported the COF Suit to Chubb."  *Id.*

[5]INIC also cites to *WellPoint, Inc. v. National Union Fire Ins. Co.*, 29 N.E.3d 716, 725 (Ind. 2015), as an example of the Indiana Supreme Court "enforcing insurance policy language in light of the very strong presumption of enforceability of contracts, and the relative equality of sophistication and bargaining power among the parties."  The Court notes that that case did not involve the application of the *contra proferentem* rule and that its holding was not based on the

the discussion of policy language, but that discussion involved the amendment of language in Emmis's policy with National Union, not INIC, and INIC itself argues that that language is "simply irrelevant to the issues before the Court as the National Union policy has different language than the [INIC] Policy and was issued for a different time period." Dkt. No. 62 at 15. Accordingly, there is no evidence in the record to support a finding that Emmis had the sophistication and bargaining power necessary to negotiate the language used in the INIC Policy, let alone that it exercised that power such that the policy language should not be construed against INIC. *See Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 313-14 (7th Cir. 1992) (holding that actual evidence, not simply bald assertion, that two parties negotiated the terms of an insurance policy was necessary to support a finding that the general rule of *contra proferentem* was not applicable). Accordingly, the language defining Event #2 is subject to the rule of *contra proferentem* and the Court, interpreting it against the insured, finds that it refers only to those claims that had been reported under the Chubb Policy as of the effective date of the INIC policy.

### 2. Section (ii)

INIC next argues that the COF Suit is excluded from coverage by Section (ii) of the Exclusion, which provides that INIC "shall not be liable to make any payment for Loss in connection with . . . the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) Event(s); or (b) any Claim(s) arising from the Event(s)." INIC argues that the COF Suit

---

fact that the insured was "a sophisticated corporate insured," as INIC describes Emmis, but rather on the fact that the case "involve[d] a multi-million dollar multi-tiered insurance arrangement. The contracts at issue reinsure Anthem's self-insured excess policies for E & O liability. Anthem and the Excess Reinsurers are sophisticated, professional insurance companies." *Id.* at 724.

falls under subsection (a) because it falls under the definition of Event #2; that argument is addressed above. INIC also argues the following:

> The Shareholder Litigation was a result of the 2010 Go-Private Attempt. The Alden Action was in connection with the resolution of the Shareholder Litigation. The settlement of the Alden Action enabled Emmis to accomplish one of the key goals of the 2010 Go-Private Attempt: control of more Preferred Stock. As the COF Suit court stated:
>
>> as part of a broader agreement to settle all litigation elated [sic] to its pullout from 2010 go-private transaction, Alden Capital agreed to enter into a TRS transaction with Emmis involving over 1,000,000 shares of Preferred Stock.
>
> The settlement of the Alden Action then became one of the subjects in the COF Suit. As evidenced by the resolution of the Shareholder Litigation and the settlement of the Alden Action, the COF Suit satisfies section (ii) as it is in connection with the "prosecution, adjudication, settlement, disposition, resolution or defense" of any Event(s).

Dkt. No. 54 at 19-20 (citing Dkt. No. 54-2 at 253 and Dkt. No. 54-4 at 6).[6]  As Emmis correctly points out, this argument ignores the plain language of subsection (a), which excludes coverage for a "loss" paid "in connection with the prosecution, adjudication, settlement, disposition, resolution or defense of" the Alden Action or the Shareholder Suits.  This language unambiguously refers to payments made by Emmis to prosecute, adjudicate, settle, dispose of, resolve, or defend the Alden Action or the Shareholder Suits.  It does not include Emmis's defense costs in the COF Suit.

INIC next argues that the COF Suit falls under subsection (b) of Section (ii), which excludes coverage for any Loss in connection with "any Claim(s) arising from the Event(s)." INIC argues that the COF Suit is a claim "arising under" Events #1 and #2, the Shareholder Suit and the Alden Action.  The Court disagrees.  As INIC recognizes, "[i]n Indiana, the phrase

---

[6]INIC cites to ¶ 27, but the correct citation actually is ¶ 24.

'arising out of' as used in insurance policies long has been construed to mean that one thing must be the 'efficient and predominating' cause of something else." Dkt. No. 54 at 20 (quoting *Indiana Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*. 291 N.E.2d 897, 899 (1973)). INIC argues that

> Here, the Shareholder Litigation and/or the Alden Action caused the COF Suit as evidenced by the express allegations in both the original complaint and the second amended complaint in the COF Suit regarding acts and circumstances surrounding the 2010 Go-Private Attempt and Smulyan's alleged frustration at not being able to amend the terms of the preferred stock to strip rights and take Emmis private. In fact, Plaintiff even admits in its coverage complaint that ". . . the initial complaint in the COF Suit contained allegations that the Preferred Stock Repurchase Plan was motivated by the failure of the 2010 Go-Private Attempt and Emmis's desire to punish the Preferred Stock shareholders for that failure . . . ."

Dkt. No. 54 at 20-21. That argument is without merit. The plaintiffs in the COF Suit did not sue Emmis *because of* the Shareholder Litigation or *because of* the Alden Action. Those previous *cases* simply were not the cause of the COF Action. The fact that the complaints in the cases included some of the same factual allegations is simply irrelevant to the inquiry of whether the earlier cases were a *cause* of the COF Action.[7]

### 3. Section (iii)

The overlapping factual allegations are relevant to the potential application of Section (iii) to the COF Suit, however. Section (iii) excludes coverage for any loss in connection with "any Claim alleging, arising out of, based upon, attributable to or in any way related directly or

---

[7]INIC also argues that "[t]he alleged Wrongful Acts in the COF Suit also 'arise from' the Shareholder Litigation and/or the Alden Action. For example, both the Shareholder Litigation and the COF Suit alleged that in order to eliminate the burden of the Preferred Stock and the rights of the preferred shareholders, Emmis and Smulyan pursued the same strategy: to obtain the two-thirds voting control necessary to effectuate the proposed amendments by first obtaining control of Alden's 42%." Dkt. No. 54 at 21. Subsection (b) of Section (ii) does not use the term "wrongful acts," however, so that argument is irrelevant to the application of subsection (b) to the COF Suit.

indirectly, in part or in whole, to an Interrelated Wrongful Act (as that term is defined below)." Dkt. No. 54-3 at 67. "Interrelated Wrongful Act" is defined as "(i) the same or related facts, circumstances, situations, transactions or events alleged in any of the Event(s) [i.e. the Shareholder Suits or the Alden Action], and/or (ii) any Wrongful Act(s) that are the same or that are related to those that were alleged in any of the Event(s)." *Id.*

There is no question that if the plain language of Section (iii) is applied literally, the COF Suit is excluded from coverage. Read literally, Section (iii) excludes coverage for defense costs paid in connection with any claim that alleges "the same or related facts . . . alleged in" the Shareholder Suits or the Alden Action. As INIC points out, the complaint in the COF Suit contains some of the same factual allegations as the Shareholder Suits and the Alden Action, and in some instances, the same factual allegations are contained in all three. *See* Dkt. No. 54 at 23 (setting out shared factual allegations).

If Section (iii) were to be applied literally, it would mean that *any* shared factual allegation would be sufficient to trigger the exclusion, including the allegation that Emmis is a publicly-traded corporation, or even simply that Emmis does business in Indiana. "'[A] contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek.'" *Sirazi v. Gen. Mediterranean Holding*, 826 F.3d 920, 925 (7th Cir. 2016) (quoting *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859-60 (7th Cir. 2002) (applying Indiana law)). The parties are very unlikely to have intended Section (iii) to be applied literally, as doing so would lead to the exclusion of virtually any lawsuit filed against Emmis. For example, the complaints in both the Alden Action and at least one of the Shareholder Suits allege that Emmis is a publicly traded company and that it is incorporated in Indiana. *See* Dkt.

No. 54-2 at 201 ¶ 8 (Complaint in Alden Action) (alleging that Emmis is a publicly traded Indiana corporation with its executive offices in Indiana); *see also* Dkt. No. 54-2 at 148 ¶¶ 15, 16 (Complaint in one of the Shareholder Suits) (alleging that Emmis is an Indiana corporation with its principal offices in Indiana "that stock trades on the NASDAQ"). Pursuant to Federal Rule of Civil Procedure 8(a)(1), any suit relying on diversity jurisdiction would have to contain allegations relating to Emmis's citizenship—i.e., that it is an Indiana corporation with its principal place of business in Indiana. Indeed, such allegations routinely are included in complaints even when they are not required to show the basis for the court's jurisdiction. *See, e.g.,* the complaints in 1:09-cv-525-SEB-TAB and 1:16-cv-2568-JMS-MJD (both employment discrimination cases brought against Emmis pursuant to federal statutes in which the complaints allege that Emmis is an Indiana corporation). It would be nonsensical to read Section (iii) in such a way that whether Emmis had insurance coverage for a lawsuit filed against it would depend on the whim of the plaintiff's attorney who drafted the complaint in the lawsuit.

Rather than being read literally, the language of Section (iii) must be read to exclude only those claims that share *operative facts* with the Shareholder Suits and/or the Alden Action; that is, facts that form the basis of the causes of action asserted in the lawsuits. While complaints are required only to set forth a short and plain statement of facts that show the plaintiff is entitled to relief, lawyers often have strategic reasons for including far more than the necessary facts in a complaint. For example, background facts might be included to give the reader context, or certain facts might be included to paint the defendant in a negative light or generate sympathy for the plaintiff.

INIC does not appear to urge a literal reading of Section (iii), but rather argues that the allegations in the COF Suit are "related to" those in the Shareholder Suits and the Alden Action and therefore the exclusion applies. As INIC correctly notes, the Seventh Circuit

> has held that in interpreting a contract under Indiana law, "related" has a common understanding and meaning and "covers a very broad range of connections, both causal and logical." *Gregory v. Home Ins. Co.,* 876 F.2d 602, 606 (7th Cir.1989); *See Am. Home Assurance Co. v. Allen,* 814 N.E.2d 662, 669 (Ind. Ct. App. 2004). In other words, it means "having relationship: connected by reason of an established or discoverable relation." *Gregory,* 876 F.2d at 606, n. 5 (quoting Webster's Third New Int'l Dictionary (1981)). This release language which the parties freely negotiated is broad, but its expansiveness does not create an ambiguity.

*RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008). INIC argues that the allegations in the COF Suit are "logically connected" to those in the Shareholder Suits and the Alden Action because the cases all "alleged acts and claims related to the 2010 Go-Private Attempt and Smulyan's and Emmis' alleged improper attempts to strip the preferred shareholders of their rights." Dkt. No. 54 at 22; *see also* Dkt. No. 62 at 4 (noting that "the Shareholder Litigation, the Alden Action, and the COF Suit all involve the 2010 Go-Private Attempt and Emmis's attempts to gain control of voting power" and "the COF Suit contained allegations that the Preferred Stock Repurchase Plan was motivated by the failure of the 2010 Go-Private Attempt and Emmis's desire to punish the Preferred Stock shareholders for that failure").

The question is whether the allegations that the COF Suit shares with the Shareholder Suits and the Alden Action were operative facts in the COF Suit or merely window dressing included in the COF Suit for some purpose other than supporting the legal claims made therein. The Court finds that they were the latter. The Plaintiffs in the COF Suit alleged that Emmis took various actions and failed to take certain actions in 2011 and 2012 and that those actions and omissions violated various federal statutes and Indiana law. The allegations that Emmis took the

alleged actions in order to "punish" its Preferred Stock Shareholders or out of "frustration" related to the 2010 Go-Private Attempt are simply irrelevant to any of the causes of action in the COF Suit, which is demonstrated by the fact that those allegations were omitted by the Plaintiffs in their Second Amended Complaint in the COF Suit and not mentioned by the court in granting summary judgment in that case. Nor is it relevant to those causes of action that Emmis's goal in taking those actions may have been the same as Emmis's goal in the 2010 Go-Private Attempt. In other words, the legal basis for the COF Suit would have remained the same if the 2010 Go-Private Attempt never happened; the operative facts in the COF Suit were Emmis's actions and omission in 2011 and 2012.

INIC also argues that Section (iii) applies because "the wrongful acts alleged in both the Shareholder Litigation and the COF Suit primarily consisted of the alleged improper attempts to effectuate the same proposed amendments in part by controlling the voting power of Alden's 42% of the preferred shares to strip the preferred shareholders of their rights" and "obtain the ability to take Emmis private 'at a time of [Smulyan's] choosing.'" Dkt. No. 54 at 24 (citing Exh. 5 at ¶ 27 and Exh. 1-P at ¶ 28). But having a goal—to gain the ability to take Emmis private—it not a "wrongful act." The alleged wrongful acts in the various lawsuits were the actions and omissions of Emmis that (allegedly) were taken to effectuate that goal. A suit alleging that Smulyan "really wants to take Emmis private" would have no legal basis, and wholly different actions taken at different times do not share operative facts such that they are reasonably considered "the same or related" simply because they may have been taken with the same goal in mind.

None of the cases cited by INIC support such a broad application of the language of Section (iii). For example, in *RSUI Indem. Co. v. WorldWide Wagering, Inc.*, 2017 WL

3023748, at *7 (N.D. Ill. July 17, 2017), *reconsideration denied sub nom. RSUI Indem. Co. v. World Wide Wagering, Inc.,* 2017 WL 4512922 (N.D. Ill. Oct. 10, 2017), the court found a direct causal connection between the two cases at issue, holding that "[if] Defendants and their entities had not been liable for the massive judgment in the Riverboat Matter, they would not have engaged in a scheme to fraudulently transfer their assets in breach of their fiduciary duties. The Riverboat Matter caused Defendants to enter into the scheme alleged in the Underlying Litigation." As discussed above, that is simply not the case here. In *Langdale Co. v. National Union Fire Ins. Co.*, 110 F. Supp. 3d 1285 (N.D. Ga. 2014), *aff'd on other grounds by* 609 Fed. Appx. 578 (11th Cir. 2015), the court did not, as INIC asserts, find that a similarly worded exclusion applied "because the insurer pointed to several paragraphs in the complaint at issue that were essentially identical or similar to those in the prior litigation, which was listed as an "Event" in the endorsement." Dkt. No. 54 at 22. Rather, the court found that the lawsuit at issue "arose out of" and was related to "the same facts alleged and the wrongful acts identified in Paragraphs 38-42 of" the prior litigation and that a "fact-intensive inquiry as to whether the Wrongful Acts [alleged in the two lawsuits were] logically related and [arose] out of a common nucleus of operative facts" led to the same conclusion. *Langdale Co.*, 110 F. Supp. 3d at 1311-12. And while the court in *Continental Casualty Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000), did mention the fact that the wrongful acts alleged in two lawsuits "were tied together because all were aimed at a single particular goal," it found that the exclusion applied because while the lawsuits alleged different types of acts that "resulted in a number of different harms to different persons, who may have different types of causes of action," they comprised *a single course of conduct* designed to promote investment in K.D. Trinh." (emphasis added). Because "this same course of conduct . . . serve[d] as the basis for" lawsuits, the "conduct at issue in both

cases was arguably the 'same' and at the very least 'related' in any common sense understanding of the word" and therefore the exclusion applied. *Id.* The other cases cited by INIC can be similarly distinguished from this one. *See Darwin Nat. Assur. Co. v. Westport Ins. Corp.*, 2015 WL 1475887 (E.D.N.Y. Mar. 31, 2015) (finding that the latter suit alleged a "long-standing campaign, dating back to" the earlier suit); *The One James Plaza Condo. Ass'n, Inc. v. RSUI Grp., Inc.*, 2015 WL 7760179 (D.N.J. Dec. 2, 2015) (finding a "substantial overlap of factual allegations and causes of action in the two underlying suits").

The Shareholder Suits were filed to stop the 2010 Go-Private Attempt, which involved an attempt by JSA to purchase all of Emmis's Common Stock and convert its Preferred Stock into subordinated debt instruments. The Alden Action involved the decision of Emmis to finance a lawsuit related to the 2010 Go-Private Attempt. Section (iii) excludes claims in which someone seeks to hold the insureds liable for the actions or omissions that were at issue in the Shareholder Suits and/or the Alden Action or any actions or omissions that are logically connected to them. The COF Suit simply did not seek to do that. The only connection between the COF Suit and the other suits is that the 2010 Go-Private Attempt is mentioned in the COF Suit as part of the historical context of the relationship between Emmis and its shareholders. That is not enough to bring the COF Suit under Section (iii) and exclude it from coverage.

### 4. Conclusion

There is no dispute that, in the absence of an applicable exclusion, the INIC Policy provides coverage for the COF Suit. For the reasons set forth above, the Court determines that there are no genuine issues of material fact with regard to the application of the Exclusion to the

COF Suit and, as a matter of law, the Exclusion does not apply to the COF Suit. Accordingly,

Emmis is entitled to summary judgment in its favor with regard to its breach of contract claim.[8]

## B. Breach of the Duty of Good Faith and Fair Dealing

In its Complaint, Emmis alleges that INIC breached its duty of good faith and fair dealing

by denying coverage for the COF Suit without a legitimate basis for doing so and in so doing

ignored relevant information and placed its own monetary interests ahead of its insured's

interests.

> Indiana law has long recognized a legal duty, implied in all insurance contracts, for
> the insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman,* 622
> N.E.2d 515, 518 (Ind.1993); *Vernon Fire & Cas. Ins. Co. v. Sharp,* 264 Ind. 599,
> 349 N.E.2d 173, 181 (1976). In recognizing a cause of action in tort for a breach of
> that duty, we have also noted that a cause of action will not arise every time an
> insurance claim is denied. *Hickman,* 622 N.E.2d at 520. For example, a good faith
> dispute about whether the insured has a valid claim will not supply the grounds for
> recovery in tort for the breach of the obligation to exercise good faith. *Id.* On the
> other hand, an insurer that denies liability knowing there is no rational, principled
> basis for doing so has breached its duty. *Id.* To prove bad faith, the plaintiff must
> establish, with clear and convincing evidence, that the insurer had knowledge that
> there was no legitimate basis for denying liability. *Ind. Ins. Co. v. Plummer Power
> Mower & Tool Rental, Inc.,* 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992).

*Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). INIC moves for summary judgment

on this claim, arguing that Emmis does not have the requisite clear and convincing evidence of

"any conscious wrongdoing, dishonest purpose, moral obliquity, furtive design, or ill will on the

part of [INIC] in denying coverage." Dkt. No. 54.

In response to INIC's motion, Emmis had the burden of pointing to evidence of record

from which a reasonable juror could conclude that INIC breached its duty of good faith and fair

dealing. *See Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016) ("As we have said before,

---

[8]In light of this holding, the Court need not consider Emmis's arguments with regard to
INIC's duty to advance defense costs.

summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (citation omitted). Emmis failed to do so. Emmis's argument on the issue consists only of a summary of its arguments in support of its breach of contract claim. While the Court agrees that INIC's position that the Exclusion applied to the COF Suit was incorrect as a matter of law, that, alone, is not sufficient to support Emmis's breach of the duty of good faith and fair dealing claim. Emmis simply points to no evidence that INIC's denial was made in bad faith.[9] Accordingly, INIC is entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons set forth above, INIC's motion for summary judgment is **GRANTED** with regard to Emmis's breach of the duty of good faith and fair dealing claim and **DENIED** with regard to Emmis's breach of contract claim. Emmis's motion for partial summary judgment is **GRANTED**. Emmis is entitled to coverage under the INIC Policy for its defense costs in the COF Suit. As Emmis has only moved for judgment on the issue of liability on the breach of contract claim, the parties shall confer and file a joint notice **within 28 days of the date of this Entry** setting forth how they wish to proceed to resolve this case.

SO ORDERED: 3/21/18

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification

---

[9]Emmis argues that "INIC's summary judgment motion only seeks summary judgment on the issue of bad faith, which is distinct from a breach of the duty of good faith and fair dealing under Indiana law." Dkt. No. 61 at 60. Emmis does not elaborate on this statement, and, as the quote above indicates, the Indiana Supreme Court has spoken in terms of the plaintiff's burden in a breach of the duty of good faith and fair dealing claim as "proving bad faith."